**ORIGINAL**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

MAY - 5 2004

Betty A. Griess, Clerk
Cheyenne

Michael D. Smith
HOLLAND & HART LLP
2515 Warren Avenue
P. O. Box 1347 (82003)
Cheyenne, Wyoming 82001
Telephone:  (307) 778-4200
Facsimile:  (307) 778-8175

Donald A. Degnan
Timothy P. Getzoff
HOLLAND & HART LLP
1050 Walnut Street, Suite 500
Boulder, Colorado 80302-5144
Telephone:  (303) 473-2700
Facsimile:  (303) 473-2720

ATTORNEYS FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| LDE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> DYNO NOBEL INC., <br><br> Defendant. | Civil Action No. 04 CV 0137 J |

## COMPLAINT AND JURY DEMAND

Plaintiff LDE Corporation ("LDE"), by and through its attorneys, hereby submits this Complaint against defendant Dyno Nobel, Inc. ("Dyno") as follows:

Receipt # 303478
Summons;_____ issued
    X  not issued

## JURISDICTION AND VENUE

1. Jurisdiction is founded upon 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337. Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

2. Plaintiff LDE is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business located at 303 East 4th Street, P.O. Box 370, Joplin, Missouri 64802.

3. LDE is a small company that offers commercial blasting services and related technology to mines and other consumers of bulk ammonium nitrate-based explosive products. LDE's principal product is an explosives technology sold under the trade name "*Soft*LOAD." *Soft*LOAD is based on a new explosives technology developed by LDE that has several advantages over prior explosives products.

4. Defendant Dyno is a Delaware corporation with its principal place of business located at 50 South Main Street, Salt Lake City, Utah 84114.

5. Dyno is a multi-national explosives company with more than 4,300 employees located across the globe in North America, Latin America, Europe and Africa, and the Asia Pacific region.

2

## BACKGROUND

### DYNO's Monopoly of AN-based Explosives for use in Commercial Mines in the United States.

6.      Prior to the introduction of LDE's *Soft*LOAD product in the U.S. market in April 2002, the most frequently used bulk explosive was a product called "ANFO," which is a simple mixture of ammonium nitrate (AN) and fuel oil (FO) at a ratio of approximately 94% AN and 6% FO. The ammonium nitrate absorbs the fuel oil, and the resulting composition is a granular, particulate substance that is dry to the touch.

7.      On information and belief, Dyno controls a majority of the market share for ANFO-based explosive products sold to mines in the United States.

8.      Traditional ANFO has several drawbacks. First, mine operators and blasters often complain about the lack of variability in the energy output of a blast using ANFO. This results in the blaster often having to use too high or too low an energy output for the type of rock or blasting situation. Second, the lack of flexibility in traditional ANFO often causes unintended, adverse environmental outcomes from blasting, including the release of toxic gases and unnecessary destruction of land.

### The Advantages of LDE's *Soft*Load Product.

9.      To solve these and other problems, LDE developed its *Soft*LOAD technology. This technology is very flexible and can be blended to provide a wide range of explosive energy outputs. This allows blasters to tailor the blasting agent for a

3

variety of specific blasting situations and rock formations (hard, soft, or medium). In addition, *Soft*LOAD's flexibility gives the blaster greater control and the ability to predict and manage environmental outcomes. Finally, *Soft*LOAD uses relatively high volumes of a specialized inert bulking agent (material added to control the bulk density of the explosive composition), which decreases the amount of explosive actually used and reduces the overall cost to the blaster.

10. In contrast to Dyno Nobel's ANFO explosives that are <u>high density</u>, <u>high velocity</u> and <u>expensive</u>, LDE's *Soft*LOAD product is <u>low density</u>, <u>low velocity</u> and <u>inexpensive</u>.

11. For commercial mines, the costs savings of *Soft*LOAD has been one of the most attractive features.

12. In contrast to the dry, particulate consistency of traditional ANFO, *Soft*LOAD is a "wet" product made from three components: (1) a liquid emulsion explosive; (2) ANFO; and (3) a single-element bulking agent made from rice hulls. The liquid emulsion coats the ANFO, which significantly increases its density and enhances its resistance to any water in the blast-hole.

13. Because *Soft*LOAD contains a relatively large amount of this liquid emulsion, the product has a relatively "wet" consistency and is not susceptible to the problems commonly associated with dry compositions—such as being blown away during mixing or becoming separated into its component parts during loading.

4

*Soft*LOAD also is thick and relatively "wet to the touch," leaving a wet residue on your hand when you touch it.

14. The wet consistency of *Soft*LOAD also means that it cannot be packaged or transported in paper or any other material that absorbs liquid. *Soft*LOAD has a separate liquid that forms in the composition and that is absorbed when the composition comes into contact with substances like paper. Because of *Soft*LOAD's wet consistency, it is almost always mixed on-site, then loaded directly into the blast hole.

15. *Soft*LOAD uses rice hulls as a bulking agent to help control the density and explosive energy of the composition. Rice hulls are the only bulking agent in *Soft*LOAD. The hulls used in *Soft*LOAD are pure hulls; *Soft*LOAD does not use any type of bulking-agent additive.

**Dyno's Response to the Introduction of *Soft*LOAD.**

16. *Soft*LOAD was tested successfully in the United States on April 11, 2002 at a mine operated by Peabody Energy called Black Thunder outside Gillette, Wyoming.

17. This test was of grave concern to Dyno and presented a serious threat to its continued control over the explosives used by commercial mines in the United States—such as Peabody. More than nine Dyno employees witnessed LDE's test shot (a test blast). Dyno employees drafted a "confidential memo" dated April 15, 2002 that contains their observations of the test.

5

18.  By all accounts, including Dyno's, LDE's test of its *Soft*LOAD product was a huge success. LDE had proven that it could provide a viable, low-cost alternative to Dyno's ANFO-based offerings.

19.  Dyno's stranglehold on the supply of explosive products to commercial mines such as Peabody was at risk—and Dyno was very nervous.

20.  Under its contracts with Peabody (and possibly others), if Peabody was satisfied with the *Soft*LOAD test shots, Dyno had only 90 days to offer a comparable product. The problem at Dyno was that it had no comparable product to offer.

21.  Not only was Dyno at risk of losing its contracts with commercial mines (such as Peabody), it knew that if LDE's product entered the market it would result in a huge loss of income to Dyno. During the couple of months when LDE was conducting its test shots of its *Soft*LOAD product at Peabody's mine outside Gillette, Dyno saw its earnings decline significantly and was concerned that the competition from LDE's *Soft*LOAD product may present Dyno's greatest financial problem in 2002.

22.  The clock was ticking, and Dyno needed to move fast. Dyno needed to stop LDE in its tracks and prevent it from establishing a foothold in the market that Dyno had virtually owned for years. Dyno's options were not good.

23.  It could try to play catch-up and work quickly to develop a product that would be competitive to LDE's *Soft*LOAD product. However, Dyno knew this would be costly and was not convinced it could develop a viable competitive product. Years

6

earlier, Dyno had attempted to develop a low-density product (similar to LDE's *Soft*LOAD product) that it called Titan Husky. However, Dyno was never able to conduct a successful test shot of this product. Even if they could develop the product, Dyno would need to purchase new types of trucks (or reconfigure old trucks) to be used with the product. (At the time of LDE's test shot of *Soft*LOAD, Dyno's trucks were configured incorrectly for use with a *Soft*LOAD-type product.) Dyno also recognized it would have significantly higher labor costs and less revenue (due to the reduced amount of ammonium nitrate in a *Soft*LOAD-type product) if it developed and sold a product that could compete with LDE's *Soft*LOAD.

24. Alternatively, Dyno could allow LDE to sell its *Soft*LOAD product in its market and try to compete with its existing products. This also was not a good option for Dyno. Dyno knew that if it attempted to compete with *Soft*LOAD, it would inevitably lose some market share (resulting in a loss of revenue). This loss would be compounded by a reduction in the amount of ammonium nitrate and/or ANFO that Dyno would sell because *Soft*LOAD uses a bulking agent as a partial substitute for ANFO. As Dyno recognized—this option presented a financial risk it was not willing to take.

### Left with no other viable option, Dyno files a baseless lawsuit against LDE hoping to drive LDE from the market or, at a minimum, to buy time to develop a product to compete with *Soft*LOAD.

25. Hoping to stop LDE in its tracks so that it could buy time to develop a product to compete with *Soft*LOAD, or, better yet, to drive LDE out of the market for

7

ammonium-nitrate-based commercial explosives, Dyno filed a lawsuit on October 24, 2002 against LDE, alleging that LDE's technology infringed U.S. Patent No. 4,875,950 ("the '950 Patent"). The case was captioned *Dyno Nobel, Inc. v. LDE Corp.*, No. 02-CV-199 J (D. Wy.) (Honorable Judge Johnson) (*"Dyno Patent Case"*).

26. To maintain its patent infringement claims against LDE, Dyno was forced to adopt objectively baseless and unreasonable interpretations of the claims in the '950 Patent. Moreover, irrespective of Dyno's interpretation, Dyno's claim of infringement was objectively baseless and unreasonable.

27. Upon review of the file history and the prior art cited in the prosecution of the '950 Patent (and its Australian counterpart), it becomes evident that the position Dyno took with respect to the meaning and scope of the claims of the '950 Patent was not objectively reasonable.

28. For example, the claims of the '950 Patent (in light of the prosecution history and cited prior art) plainly require the use of a "dry mix" explosive composition and a special "additive" that is added to the bulking agent of the composition. LDE's *Soft*LOAD technology, in contrast, is a "wet" composition and does not use any type of "additive."

29. Faced with these facts, to assert infringement of the '950 Patent, Dyno was forced to argue that the word "dry" could cover compositions that are "wet or dry"

and that the patent's requirement of an "additive" does not actually require the use of an additive.

31. Dyno's proposed interpretation of the '950 Patent not only made the claims <u>nonsensical</u> and <u>internally inconsistent</u>, it <u>ignored the plain meaning of the words used in the claims</u>. In essence, Dyno's proposed interpretation was a request that the claims be <u>completely re-written</u> to cover LDE's new technology.

31. On April 18, 2003, the *Dyno Patent Case* Court held a *Markman* hearing to interpret the claims of the '950 Patent.

32. Following this hearing, the Court issued a Claim Construction Order recognizing the problems inherent in Dyno's proposed interpretation. Specifically, the Court held that "[c]onstruing claim 1 [of the '950 Patent] as advocated by Dyno Nobel, <u>would require the Court to completely re-write the claims</u>." (Order at 21 (emphasis added)) In reaching this conclusion, the Court found that "Dyno's proposed interpretation is <u>nonsensical and violates the plain meaning</u>" of a key phrase in claim 1 of the '950 Patent. (*Id.* at 19 (emphasis added))

33. Apparently, Dyno knew all along that its position on claim interpretation was neither reasonable nor supported by the claim language and file history. Instead of appealing the Court's Claim Construction ruling or proceeding with its lawsuit, Dyno decided to abandon its claims of patent infringement against LDE.

9

34.     On February 18, 2004, Dyno agreed to a Stipulated Judgment of Noninfringement stating "that the products made and/or sold by LDE under the trade name *Soft*LOAD at issue in this action do not infringe any claim of the '950 Patent."

35.     On February 19, 2004, the Stipulated Judgment of Noninfringement was signed and entered by the Court—effectively dispensing of Dyno's baseless claims against LDE.

36.     Prior to the lawsuit being filed, LDE had been successful in getting a foothold into Peabody's mine outside of Gillette, Wyoming and had discussions with Peabody regarding expanding the use of *Soft*LOAD in the Gillette mine and extending the use of *Soft*LOAD to other Peabody operations in the U.S. Those discussions were put on hold when Dyno filed the *Dyno Patent Case*.

37.     Similarly, prior to Dyno filing the *Dyno Patent Case*, LDE had discussions with Wesco about entering into a joint venture agreement that would expand the use of LDE's *Soft*LOAD product into Wesco's operations. Those discussions were put on hold when Dyno filed the *Dyno Patent Case*.

38.     On information and belief, before filing this *Dyno Patent Case*, Dyno contacted many of LDE's customers and potential customers and encouraged them not to do business with LDE. These, and other actions, have severely harmed LDE's business, resulting in several lost probable accounts and making it difficult to generate new business. In addition, LDE has been forced to spend hundreds of thousands of

dollars in attorneys' fees and other costs to defend itself against the baseless claims brought against it in the *Dyno Patent Case*.

### Dyno is an Admitted Monopolist.

39. In 1995, Dyno pled guilty to criminal violations of the Sherman Act and paid $15 million in criminal fines for conspiring to fix prices and eliminate competition in the market for ammonium-nitrate-based explosive products. At the time, this $15 million fine was the largest imposed on a single defendant in a criminal antitrust case.

40. A defined market, or sub-market, exists for ammonium-nitrate-based commercial explosive products. Through its actions in the *Dyno Patent Case* and in the market, Dyno continues to monopolize, or attempt to monopolize, the market for ammonium-nitrate-based commercial explosive products, or a sub-market of ammonium-nitrate-based commercial explosive products, in the United States.

### FIRST CAUSE OF ACTION

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT

41. LDE incorporates the preceding allegations of this Complaint.

42. The *Dyno Patent Case* was a sham litigation initiated in bad faith. Dyno filed the case in an effort to impose collateral, anti-competitive injury rather than to obtain a justifiable legal remedy. In doing so, it interfered directly with the business relationships of one of its competitors, LDE.

43. The claim of patent infringement by Dyno in the *Dyno Patent Case* was objectively baseless for several independent reasons and no reasonable litigant could have expected success on the merits.

44. Dyno has exclusionary power within, and has monopolized, or attempted to monopolize, relevant markets and/or sub-markets for ammonium-nitrate-based commercial explosive products. It possesses, or threatens to possess, the ability to lessen competition in these markets. Dyno's actions were undertaken with the specific intent to monopolize and/or maintain its monopoly in these markets and/or sub-markets and have achieved or have a dangerous probability of achieving monopoly power in these markets.

45. As a direct and proximate result of Dyno's violation of Section 2 of the Sherman Act, LDE has sustained and will continue to sustain injury to its business and property in an amount not yet precisely ascertainable, but including, without limitation, the loss of sales of its products and services and the cost of defending itself against a baseless claim of patent infringement in the *Dyno Patent Case*.

## SECOND CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACT AND PROSPECTIVE CONTRACTUAL RELATIONS

46. LDE incorporates the preceding allegations of this Complaint.

47.     The claim of patent infringement by Dyno in the *Dyno Patent Case* was objectively baseless and no reasonable litigant could have expected success on the merits. Prior to filing this claim, Dyno knew that LDE's *Soft*LOAD product did not infringe its '950 Patent. As a result, Dyno attempted to enforce a patent in bad faith.

48.     Nonetheless, Dyno contacted businesses with whom LDE had potential contractual relationships for the supply of components used in commercial explosives (and/or related services), and/or from which LDE had a reasonable expectation of an economic advantage, with knowledge of those contractual relationships, and told these businesses that the components offered by LDE (and/or related services) infringed Dyno's '950 Patent.

49.     As a result of these actions, taken in bad faith by Dyno, certain of these businesses stopped purchasing components used in commercial explosives from LDE or were caused to not enter into or continue a prospective relationship with LDE.

50.     Dyno's actions were intentional and improper.

51.     Dyno's acts have caused, and continue to cause, LDE to suffer damage in an amount to be determined at trial.

52.     Dyno's acts, and the resulting injury to LDE, were attended by circumstances of malice and constitute willful and wanton conduct committed with reckless disregard of the consequences to the rights of LDE.

FOR THESE REASONS, LDE respectfully requests that judgment be entered in its favor of LDE and against Dyno as follows:

A. That LDE be awarded its damages arising from Dyno's wrongful acts in an amount to be determined at trial;

B. That the damages caused by Dyno's violation of Section 2 of the Sherman Act be trebled pursuant to 15 U.S.C. § 15(a);

C. That LDE be awarded exemplary and punitive damages in an amount to be determined at trial;

D. That LDE be awarded pre-judgment and post-judgment interest on all damages; and

E. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

LDE demands a jury on all issues so triable.

Dated: May 5, 2004

*Michael D. Smith*
Michael D. Smith
HOLLAND & HART LLP
2515 Warren Avenue
P. O. Box 1347 (82003)
Cheyenne, Wyoming 82001
Telephone:  (307) 778-4200
Facsimile:   (307) 778-8175

Donald A. Degnan
Timothy P. Getzoff
HOLLAND & HART LLP
1050 Walnut Street, Suite 500
Boulder, Colorado 80302-5144
Telephone:  (303) 473-2700
Facsimile:   (303) 473-2720

**ATTORNEYS FOR PLAINTIFF
LDE CORPORATION**